## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| DAHRA ENGINEERING & SECURITY SERVICES LLC, an Oman corporation<br><br>              Plaintiff,<br><br>   v.<br><br>L3 SECURITY & DETECTION SYSTEMS, INC., a Delaware corporation,<br><br>              Defendant. | Case No. 20CV2172 JMF |

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF
## L3 SECURITY & DETECTION SYSTEMS, INC. TO STAY THE ACTION IN FAVOR
## OF ARBITRATION, OR, ALTERNATIVELY, TO DISMISS COUNTS II AND III OF
## THE COMPLAINT

John C. Scalzo
Christopher P. Hoffman
599 Lexington Avenue
New York, NY 10022
Tel. (212) 521-5400
Fax (212) 521-5450
jscalzo@reedsmith.com
choffman@reedsmith.com

*Attorneys for Defendant*
*L3 Security & Detection Systems,*
*Inc.*

OF COUNSEL:

REED SMITH LLP
Karlin E. Sangdahl
10 South Wacker Drive
40th Floor
Chicago, IL 60606
Tel. (312) 207-1000
Fax (312) 207-6400
ksangdahl@reedsmith.com

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................... 1

BACKGROUND FACTS ......................................................................... 4

    A.    Dahra Accepts L3 SDS's Price Proposal And Terms And Conditions For The Purchase Of Two CX-Mobile X-Ray Units.................................. 4

    B.    L3 SDS's Terms And Conditions Require That All Disputes Between The Parties Be Arbitrated Before The ICC .................................. 6

    C.    The Parties Negotiate, But L3 SDS Does Not Sign, The February 2016 Product Support Agreement.................................................. 6

ARGUMENT ...................................................................................... 8

I.    THE ISSUE OF ARBITRABILITY ITSELF IS ARBITRABLE UNDER CLEAR AND BINDING SUPREME COURT AND SECOND CIRCUIT AUTHORITY ........... 8

II.    THE ICC ARBITRATION CLAUSE IN THE TERMS AND CONDITIONS UNQUESTIONABLY APPLIES TO COUNTS ONE AND THREE OF THE COMPLAINT ................................................................................ 11

    A.    Dahra's Claims For Breach Of, And Fraudulent Inducement To Enter Into, The Purchase Order Contract Are Plainly Subject To The Arbitration Clause In The Terms And Conditions ................................ 12

    B.    The February 2016 Product Support Agreement Does Not Supersede Or Conflict With The Terms And Conditions.................................. 15

        i.    Dahra's Claim For Breach Of The February 2016 Product Support Agreement, As Well As Its Reliance On The Agreement's Venue Clause, Fail Because Dahra Admittedly Did Not Perform Its Own Obligations Under The Agreement .................................. 16

        ii.    The Arbitration Clause In The Terms And Conditions May Only Be Amended By A Signed Writing Executed By Both Parties ................ 17

        iii.    The February 2016 Product Support Agreement And The Terms And Conditions Are Not In Conflict.................................. 18

        iv.    Dahra's Claim For Breach Of The February 2016 Purchase Order (Count II) Should Not Be Allowed To Proceed In Parallel To The Arbitration.................................................................. 20

III.    IF THE COURT RETAINS JURISDICTION OVER THIS MATTER, DAHRA'S
        CLAIMS FOR BREACH OF THE FEBRUARY 2016 PRODUCT SUPPORT
        AGREEMENT AND FRAUDULENT INDUCEMENT SHOULD BE
        DISMISSED ................................................................................................................... 22

        A.    Dahra's Claim For Breach Of The February 2016 Product Support
              Agreement Fails Because Dahra Admittedly Failed To Perform Its Own
              Obligations Under The Agreement ........................................................................ 22

        B.    Dahra's Fraudulent Inducement Claim Should Be Dismissed As
              Duplicative Of The Claim For Breach Of The Purchase Order Contract ............. 22

CONCLUSION ........................................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.*,
  307 F.3d 24 (2d Cir. 2002)...................................................................................................19

*Ace Secs. Corp. Home Equity Loan Trust, Series 2007-HE3 by HSBC Bank USA,
  Nat'l Ass'n v. DB Structured Prods., Inc.*,
  5 F. Supp. 3d 543 (S.D.N.Y. 2014) .....................................................................................17

*Alstom v. Gen. Elec. Co.*,
  228 F. Supp. 3d 244 (S.D.N.Y. 2017) (Furman, J.)...............................................................9

*Bank of N.Y. Mellon Trust Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.*,
  821 F.3d 297 (2d Cir. 2016).................................................................................................18

*Birmingham Assocs. Ltd. v. Abbott Laboratories*,
  547 F. Supp. 2d 295 (S.D.N.Y. 2008)..................................................................................12

*Blue Tee Corp. v. Koehring Co.*,
  763 F. Supp. 754 (S.D.N.Y. 1991) ......................................................................................15

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
  778 F. Supp. 2d 375 (S.D.N.Y. 2011).............................................................................17, 18

*Bridgestone/Firestone v. Recovery Credit Servs.*,
  98 F.3d 13 (2d Cir. 1996).....................................................................................................22

*Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*,
  No. 12 Civ. 5262 (JPO), 2013 WL 6388444 (S.D.N.Y. Dec. 6, 2013) ...................................2

*Collins & Aikman Prods. Co. v. Building Sys., Inc.*,
  58 F.3d 16 (2d Cir. 1995)................................................................................................12, 14

*Consol. Precision Prods. Corp. v. Gen. Elec. Co.*,
  No. 1:15-cv-08721-PKC, 2016 WL 2766662 (S.D.N.Y. May 12, 2016)...............................20

*Contec Corp. v. Remote Solution, Co.*,
  398 F.3d 205 (2d Cir. 2005)...................................................................................................9

*Coscarelli v. Esquared Hospitality LLC*,
  364 F. Supp. 3d 207 (S.D.N.Y. 2019) (Furman, J.)................................................................8

*Crescendo Mar. Co. v. Bank of Commc'ns Co.*,
  No. 15-cv-04481-JFK, 2016 WL 750351 (S.D.N.Y. Feb. 22, 2016) .....................................13

*Deutsche Bank AG v. JPMorgan Chase Bank*,
  No. 04 Civ. 7192, 2007 WL 2823129 (S.D.N.Y. Sept. 27, 2007), *aff'd*, 331
  Fed. Appx. 39 (2d Cir. 2009) .........................................................................................17

*Electron Trading LLC v. Perkins Coie LLP*,
  No. 652178/2018, 2019 WL 5067910 (N.Y. Sup. Ct., N.Y. Cty. Oct. 9, 2019)......................24

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
  837 F. Supp. 2d 162 (S.D.N.Y. 2011)..............................................................................25

*Ferrari N. Am., Inc. v. Ogner Motor Cars, Inc.*,
  No. 02 Civ 7720 (SAS), 2003 WL 102839 (S.D.N.Y. Jan. 9 2003)........................................12

*Fiona Trust & Holding Corp. v. Privalov*,
  [2008] 1 Lloyd's Rep. 254 (Lord Hope of Craighead) ...........................................................13

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995)............................................................................................................9

*Furia v. Furia*,
  116 A.D.2d 694 (2d Dep't 1986) .......................................................................................16

*Genesco, Inc. v. T. Kakiuchi & Co.*,
  815 F.2d 840 (2d Cir. 1987)...............................................................................................20

*GLC Securityholder LLC v Goldman, Sachs & Co.*,
  74 A.D.3d 611 (1st Dep't 2010) .......................................................................................18

*Global Entm't, Inc. v. N.Y. Tel. Co.*,
  No. 00 Civ. 2959 (SHS), 2000 WL 1672327 (S.D.N.Y. Nov. 6, 2000) .................................17

*Harsco Corp. v. Segui*,
  91 F.3d 337 (2d Cir. 1996)................................................................................................17

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S. Ct. 524 (2019)........................................................................................................10

*Howsam v. Dean Witter Reynolds, Inc.*,
  537 U.S. 79 (2002).............................................................................................................9

*J&L Am. Enters., Ltd. v. DSA Direct, LLC*,
  No. 401937/05, 2006 WL 216680 (N.Y. Sup. Ct., N.Y. Cty. Jan. 27, 2006) ...................16, 22

*Kantor v. 75 Worth St., LLC*,
  95 A.D.3d 718 (1st Dep't 2012) .......................................................................................24

*Katz v. Cellco P'ship*,
  794 F.3d 341 (2d Cir. 2015)..............................................................................................10

*Kleinberg v. Radian Grp., Inc.*,
   No. 01-cv-09295-RMB-GWG, 2002 WL 31422884 (S.D.N.Y. Oct. 9, 2002)........................18

*Maricultura Del Norte, S. DE R.L. DE C.V. v. Worldbusiness Capital, Inc.*,
   159 F. Supp. 3d 368 (S.D.N.Y. 2015)....................................................................................24

*Maritima De Ecologia, S.A. de C.V. v. Sealion Shipping Ltd.*,
   No. 10 Civ. 8134 (DLC), 2011 WL 1465744 (S.D.N.Y. Apr. 15, 2011) ..........................20, 21

*Martinez v. Bloomberg LP*,
   740 F.3d 221 (2d Cir. 2014)..............................................................................................13, 14

*Merrill Lynch & Co. Inc v. Allegheny Energy, Inc.*,
   500 F.3d 171 (2d Cir. 2007)....................................................................................................12

*Mobile Real Estate, LLC v. NewPoint Media Grp., LLC*,
   No. 19-CV-11475 (KMK), 2020 WL 2521451 (S.D.N.Y. May 18, 2020) ...........................20

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983)........................................................................................................................8

*Murray v. UBS Secs., LLC*,
   No. 12 Civ. 5914(KPF), 2014 WL 285093 (S.D.N.Y. Jan. 27, 2014)....................................10

*Negrete v. Citibank, N.A.*,
   759 F. App'x 42 (2d Cir. 2019) ...............................................................................................23

*Oei Hong Leong v. Goldman Sachs Group, Inc.*,
   No. 13-cv-8655 JMF, 2014 WL 2893310 (S.D.N.Y. June 25, 2014)......................................13

*Offshore Exploration & Prod., LLC v. Morgan Stanley Private Bank, N.A.*,
   626 F. App'x 303 (2d Cir. 2015) ...............................................................................................9

*Ogden Power Dev.-Cayman, Inc. v. PMR Ltd Co.*,
   No. 14-cv-8169 (PKC), 2015 WL 2414581 (S.D.N.Y. May 21, 2015).....................................9

*Oldroyd v. Elmira Sav. Bank*,
   134 F.3d 72 (2d Cir. 1998)........................................................................................................12

*Presnall v. Analogic Corp.*,
   No. 17-cv-6662, 2018 WL 4473337 (S.D.N.Y. Sept. 18, 2018) .............................................25

*Process Am., Inc. v. Cynergy Holdings, LLC*,
   839 F.3d 125 (2d Cir. 2016)......................................................................................................24

*Shaw Group, Inc. v. Triplefine Int'l Corp.*,
   322 F.3d 115 (2d Cir. 2003).................................................................................................9, 11

*Sira v. Morton*,
    380 F.3d 57 (2d Cir. 2004)..................................................................................3

*Spinelli v. Nat'l Football League*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015) ...........................................................14, 15

*Starr Indem. & Liab. Co. v. Am. Claims Mgmt., Inc.*,
    No. 14-CV-0463 (JMF), 2015 WL 2152816 (S.D.N.Y. May 7, 2015) (Furman,
    J.)..................................................................................................................19

*Taizhou Zhongneng Imp. & Exp. Co., Ltd v. Koutsobinas*,
    509 F. App'x 54 (2d Cir. 2013) .........................................................................22

*TOA Sys., Inc. v. Int'l Bus. Machs. Corp.*,
    No. 18 CV 10685 (VB), 2019 WL 5693388  (S.D.N.Y. Nov. 4, 2019) ................24

*Ust-Kamenogorsk Hydropower Plant JSC v. AES Ust-Kamenogorsk Hydropower
    Plant LLP*
    [2013] UKSC 35 .............................................................................................13

*Vella v. Atl. Int'l Fin., Inc.*,
    890 F. Supp. 321 (S.D.N.Y. 1995) ..............................................................12, 14

*VRG Linhas Aereas S.A. v. MatlinPatterson Global Opportunities Partners II
    L.P.*,
    717 F.3d 322 (2d Cir. 2013)..........................................................................9, 11

*Washington v. William Morris Endeavor Entm't, LLC*,
    No. 10 Civ. 9647 (PKC)(JCF), 2011 WL 3251504 (S.D.N.Y. July 20, 2011)...................9, 10

*Wells Fargo Bank, N.A. v. Wrights Mills Holdings, LLC*,
    No. 14-cv-9783, 2015 WL 5122590 (S.D.N.Y. Aug. 31, 2015)...............................3

**Statutes**

9 U.S.C. §§ 1 *et seq.*..................................................................................................1

9 U.S.C. § 3 ...............................................................................................................11

EAA § 1(c)...................................................................................................................8

EAA § 30(1)................................................................................................................8

EAA § 9(1)................................................................................................................21

EAA § 9(4)................................................................................................................21

**Rules**

Fed. R. Civ. P. 12(b) ....................................................................................................1

Fed. R. Civ. P. 12(b)(6)..........................................................................................4, 25

Fed. R. Civ. P. 44.1 ....................................................................................................8

Defendant L3 Security & Detection Systems, Inc. ("L3 SDS") hereby submits this Memorandum of Law in support of its Motion to stay the entire action in favor of arbitration, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* (the "FAA"), or, alternatively, to dismiss Counts II and III of the Complaint (the "Complaint") of Plaintiff Dahra Engineering & Security Services LLC ("Dahra"), pursuant to Rule 12 (b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").

## PRELIMINARY STATEMENT

This dispute arises out of the alleged failure of L3 SDS to deliver two CX-Mobile units to Dahra that conformed to the specifications in L3 SDS's April 27, 2011 Commercial Offer (the "Commercial Offer") and incorporated standard International Equipment Sales Terms and Conditions (the "Terms and Conditions"). Dahra admittedly agreed to and accepted the Terms and Conditions when it placed its August 15, 2011 purchase order (the "Purchase Order") for the two CX-Mobile units in response to L3 SDS's Commercial Offer.[1] This is the only contract between the parties signed by both Dahra and L3 SDS, and it contains a broad, mandatory arbitration provision that compels Dahra to arbitrate before the International Chamber of Commerce (the "ICC") in London its first and primary claim for breach of contract, as well as its third, duplicative claim for fraudulent inducement.[2]

---

[1] Although expressly referenced in the Complaint, and perhaps due to the commercially sensitive information they contain, Dahra did not attach to its pleading the Commercial Offer, the Purchase Order or the February 2016 Product Support Agreement that are the subject of its claims. The Commercial Offer, L3 SDS's July 11, 2011 updated price proposal, the Purchase Order accepting the Commercial Offer with revised pricing, and the February 2016 Product Support Agreement are attached to the Declaration of John C. Scalzo, dated June 15, 2020 ("Scalzo Decl."), as Exhibits A, B, C, and D, respectively. In accordance with the Court's Individual Rules and Practices in Civil Cases ¶ 7(c), L3 SDS will meet and confer with Dahra in advance of filing a letter motion seeking leave to seal or otherwise file Exhibits A–D in redacted form. Accordingly, L3 SDS has refrained from filing Exhibits A–D to the public docket pending the meet-and-confer and letter motion process.

[2] Contemporaneous with the filing of this motion, L3 SDS has commenced an ICC arbitration aimed solely at the issue of arbitrability. L3 SDS's demand contains only two counts, one seeking a declaration that Dahra's claims in Counts I and III are subject to mandatory arbitration before three arbitrators in London in accordance with the ICC Rules, and the other asserting a claim against Dahra for breach of the mandatory arbitration provision in the Terms and

Dahra's Complaint alleges that (i) L3 SDS breached the contract formed by Dahra's issuance of the Purchase Order in acceptance of L3 SDS's Commercial Offer (the "Purchase Order Contract") when L3 SDS failed to deliver two CX-Mobile units to Dahra that conformed to the Commercial Offer's specifications (Count I);[3] (ii) L3 SDS breached an unsigned "February 2016 Product Support Agreement" under which L3 SDS allegedly failed to remedy the nonconformities with the CX-Mobile units (Count II); and (iii) L3 SDS fraudulently induced Dahra to enter into the Purchase Order Contract by misrepresenting to Dahra that it would manufacture and deliver units in conformity with the Commercial Offer's specifications (Count III).  Counts I and III of Dahra's Complaint are unquestionably subject to mandatory arbitration before the ICC pursuant to the valid and enforceable arbitration provision contained in the Terms and Conditions, which requires Dahra to arbitrate before an ICC tribunal "[a]ll disputes arising in connection" with the Purchase Order Contract.  The ICC tribunal's resolution of Counts I and III will fully resolve Dahra's claim in Count II for breach of the February 2016 Product Support Agreement.

Seeking to avoid arbitration, Dahra vaguely alleges the parties agreed in an unidentified "contract"—presumably, the February 2016 Product Support Agreement, though the Complaint does not say—that "this Court is an appropriate venue in which to resolve disputes between the parties."  (Compl. ¶ 6.)  That alleged "contract," however, provides Dahra with no basis to avoid arbitration of its claims in Counts I and III.[4]  *First*, Dahra admits that it failed to comply with its

---

Conditions.  A true and correct copy of L3 SDS's Request for Arbitration to the ICC is attached as Exhibit E to the Scalzo Decl.

[3] Dahra alleges in Count I of the Complaint that L3 SDS breached the contract comprised of (i) the Commercial Offer, which L3 SDS originally made on April 27, 2011, and subsequently revised with updated pricing on July 11, 2011; (ii) the Terms and Conditions, which were expressly incorporated into the Commercial Offer; and (iii) the Purchase Order placed by Dahra in response to the Commercial Offer with the updated pricing.

[4] The Court may consider the relevant contractual documents in ruling on L3 SDS's motion.  *See Clopay Plastic Prod. Co. v. Excelsior Packaging Grp., Inc.*, 12 Civ. 5262 (JPO), 2013 WL 6388444, at *2 (S.D.N.Y. Dec. 6, 2013) ("a court may consider 'any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by

own obligations under the February 2016 Product Support Agreement, thereby precluding Dahra from maintaining a claim for breach of the February 2016 Product Support Agreement or relying on its venue clause.  *Second*, the parties agreed the ICC arbitration clause in the Terms and Conditions "may be modified only by [a] written agreement … signed by duly authorized officers of both parties" that specifically refers to the Terms and Conditions and "purports" to amend them.  Dahra does not, nor could it, allege that the February 2016 Product Support Agreement, even if enforceable (which it is not), satisfied any of these requirements.  Moreover, to the extent Dahra wishes to challenge the scope or enforceability of the ICC arbitration clause in the Terms and Conditions or their interplay with the February 2016 Product Support Agreement, that issue is for the ICC arbitrators to decide under binding Supreme Court and Second Circuit authority.  *Third,* the New York venue clause in the February 2016 Product Support Agreement is a narrow one, applicable only to legal proceedings "brought to enforce any provision of ***this*** Agreement."  (Emphasis added.)  Dahra's claim in Count II that L3 SDS failed to honor the February 2016 Product Support Agreement's upgrade and warranty provisions is the ***only*** claim in the Complaint that could arguably fall within the limited scope of this venue provision.  But that claim's outcome is entirely dependent on the success of Dahra's claim for breach of the Purchase Order Contract in Count I, which, again, is subject to mandatory ICC arbitration.  That is because, if the ICC tribunal concludes that L3 SDS supplied Dahra with conforming CX-Mobile units in accordance with its Commercial Offer, then there can be no breach by L3 SDS of the February 2016 Product Support Agreement for allegedly "failing to remediate the inability of the CX Mobile

---

reference, and documents that . . . are integral to the complaint.'" (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)).  If the documents contradict the allegations of the Complaint, those contradicted allegations are not entitled to the presumption of truth; rather, the contents of the document controls.  *See Wells Fargo Bank, N.A. v. Wrights Mills Holdings, LLC*, No. 14-cv-9783, 2015 WL 5122590, at *9 (S.D.N.Y. Aug. 31, 2015).

units to meet or exceed" the specifications outlined in the Commercial Offer.  (Compl. ¶ 55.)
Under such circumstances, courts in this Circuit have repeatedly stayed the entire action pending
the outcome of arbitration.

For these reasons, and the reasons set forth below, this action should be stayed in its entirety
pending the ICC tribunal's threshold determination of its jurisdiction over Dahra's claims for
breach of contract in Count I and fraudulent inducement in Count III.  If, however, the Court retains
jurisdiction of the action, Dahra's claim for breach of the February 2016 Product Support
Agreement in Count II and its claim for fraudulent inducement in Count III should be dismissed
for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  As noted above, Dahra is not entitled to
sue for breach of the February 2016 Product Support Agreement because it admittedly failed to
make the payment upon which L3 SDS's performance under the Agreement is expressly
conditioned.  In addition, Dahra's claim for fraudulent inducement (Count III) fails as a matter of
law because it is duplicative of its claim for breach of the Purchase Order Contract (Count I).  The
Complaint does not allege any wrongdoing by L3 SDS apart from the alleged failure to supply two
CX-Mobile units that meet the specifications in the Commercial Offer.  Because that same alleged
conduct underlies the Complaint's allegations for breach of the Purchase Order Contract, the fraud
claim is entirely duplicative and should be dismissed as a matter of law.

## BACKGROUND FACTS[5]

### A.     Dahra Accepts L3 SDS's Price Proposal And Terms And Conditions For The Purchase Of Two CX-Mobile X-Ray Units

L3 SDS is a leading supplier of X-ray screening solutions and manufactures a broad array

---

[5] The background facts are based on the non-conclusory factual allegations in the Complaint and are accepted as true only for purposes of this motion to dismiss.  The background facts disregard, however, all unsupported inferences, legal conclusions, and allegations contradicted by documents the Complaint incorporates by reference and which are attached to the Scalzo Declaration.

of screening application products.  (Scalzo Decl., Ex. A at 1.)  Since 2009, Dahra has served as L3

SDS's distributor and representative in Oman.  (Compl. ¶ 7.)  In April 2011, the Royal Guard of

Oman (the "RGO") issued a tender for the supply of two of L3 SDS's mobile cargo screening

systems, the CX-Mobile, to supplement its existing fleet.  (*Id.* ¶ 8.)  Dahra wanted to bid on the

RGO's tender and presented the opportunity to L3 SDS.  (*Id.* ¶ 9.)

On April 27, 2011, L3 SDS submitted the Commercial Offer to Dahra in response to the

RGO tender.  (*Id.* ¶ 10; *see also* Scalzo Decl., Ex. A at 2.)  L3 SDS offered to supply the two CX-

Mobile units to Dahra for $7 million at a per-unit price of $3.5 million.  (Scalzo Decl., Ex. A,

Annex B at 1.)  L3 SDS's price was "based on" Dahra's acceptance of its Terms and Conditions,

which were "expressly incorporated [into L3 SDS's Commercial Offer] and take precedence over

any terms and conditions of [Dahra]."  (*Id.* at 1, Annex B at 1.)

The Commercial Offer outlined the specifications for the CX-Mobile unit in narrative form

that describe the unit's systems, materials and options.  (*Id.* at 3–9.)  In addition, the Commercial

Offer also included a technical compliance matrix setting forth Dahra's requirements, including

the specifications from the RGO.  (*Id.*, Annex A.)  These additional requirements addressed,

among other things, the X-ray system, radios and communication, the main computer, and

logistics.  (*Id.*)

On July 11, 2011, L3 SDS submitted an updated proposal to Dahra with revised pricing

but all other material terms remained the same.  (Scalzo Decl., Ex. B.)  This time, L3 SDS offered

to supply the two CX-Mobile units to Dahra for $6.55 million at a per-unit price of $3.275 million

per unit.  (*Id.*)  L3 SDS's updated proposal, just like its original Commercial Offer, expressly

referenced, and was "based on," Dahra's acceptance of its Terms and Conditions.  (*Id.*)

On August 15, 2011, Dahra accepted L3 SDS's updated commercial offer by placing the Purchase Order with L3 SDS for the purchase of two CX-Mobile units for $6.55 million at a per-unit price of $3.275 million per unit. (Scalzo Decl., Ex. C.) The Purchase Order specifically referenced L3 SDS's July 11, 2011 proposal, which was identical to the Commercial Offer except for pricing, and, as noted above, expressly incorporated the Terms and Conditions into the proposal. (*Id.*)

All of the payments made by Dahra for the two CX-Mobile units were made pursuant to the Purchase Order Contract. (Compl. ¶ 17.) Dahra paid $6,255,454 out of the $6,779,000 owed under the Purchase Order in five unequal installments between October 6, 2011, and January 8, 2015. (*Id.*) Dahra still owes L3 SDS a payment of $613,576 under the Purchase Order Contract. (*Id.*)

### B.     L3 SDS's Terms And Conditions Require That All Disputes Between The Parties Be Arbitrated Before The ICC

The Terms and Conditions contain a detailed, mandatory dispute resolution provision requiring that all disputes arising in connection with Dahra's purchase of the CX-Mobile units be arbitrated before three arbitrators in accordance with the ICC's Rules. Specifically, Paragraph 14 of the Terms and Conditions contains the following arbitration agreement:

> **14. ARBITRATION.** All disputes arising in connection with the present contract shall be finally settled under the rules of Conciliation and Arbitration of the International Chamber of Commerce in (location to be agreed) by three (3) arbitrators appointed in accordance with the said rules. The language to be used in the arbitral proceedings is English.

(Scalzo Decl., Ex. A, Annex B at 4 ¶ 14.) The Terms and Conditions, and the interpretation of the arbitration clause in Paragraph 14, are governed by English law. (*Id.* ¶ 13.)

### C.     The Parties Negotiate, But L3 SDS Does Not Sign, The February 2016 Product Support Agreement

L3 SDS delivered the two CX-Mobile units to the RGO in the fall of 2013 for deployment and field testing in Oman in February 2014.  (Compl. ¶¶ 24–25.)  Following the field tests, the parties attempted over the next several months to negotiate a Product Support Agreement under which L3 SDS would perform an upgrade of the CX-Mobile units' systems and deliver the upgraded units to Oman within a certain time.  (*Id.* ¶¶ 26-28.)  On February 1, 2016, Dahra sent L3 SDS a proposed Product Support Agreement signed by one of the company's managing directors (the "February 2016 Product Support Agreement").  Counsel for Dahra has confirmed to L3 SDS's counsel that L3 SDS did not sign the February 2016 Product Support Agreement. (Scalzo Decl. ¶ 7.)

Under the February 2016 Product Support Agreement, L3 SDS allegedly agreed to provide certain "Services" in exchange for "Dahra's payment of the remaining amount owed to L-3 SDS under the Purchase Order in the amount of $613,576," payable in two installments.  (Scalzo Decl., Ex. D ¶ 3.)  Dahra was required to make the first payment of $153,394 (25% of the amount still owed) "within (10) days after execution of [the] Agreement," and the second payment of $460,182 (75% of the amount still owed) "within (30) days of handover of the CX-Mobile systems pursuant to Article 6 of the Agreement."  (*Id.*)  Dahra concedes that it did not make either payment, and it still owes $613,576 to L3 SDS under the Purchase Order Contract.  (Compl. ¶¶ 17, 28.)

Although it is hardly clear from the Complaint, Dahra appears to allege venue is proper in this Court as to all of its claims based on the venue and jurisdiction clause in the February 2016 Product Support Agreement.  That clause provides, in relevant part, that "[v]enue and jurisdiction for all legal proceedings of any kind or nature brought to enforce any provisions of ***this*** Agreement shall lie within the courts of the State of New York in New York County, or in the United States District Court for the Southern District of New York."  (Scalzo Decl., Ex. D ¶ 18 (emphasis

added).)  Only one of Dahra's three causes of action—its Count II breach of contract claim—purportedly seeks to enforce the provisions of the February 2016 Product Support Agreement. None of the payments made by Dahra are alleged to have been made pursuant to the February 2016 Product Support Agreement, which was allegedly entered into more than a year after Dahra's last payment to L3 SDS in January 2015.  (Compl. ¶ 17.)

## ARGUMENT

I. **THE ISSUE OF ARBITRABILITY ITSELF IS ARBITRABLE UNDER CLEAR AND BINDING SUPREME COURT AND SECOND CIRCUIT AUTHORITY**

Dahra's first and primary claim for breach of contract, as well as its third claim for fraudulent inducement, arise directly from the Purchase Order Contract, which expressly incorporated, and was "based on," the Terms and Conditions.  Under Paragraph 14 of the Terms and Conditions, "***[a]ll disputes*** arising in connection with the [the Purchase Order Contract] ***shall*** be finally settled under the rules of Conciliation and Arbitration of the [ICC]…."  (Scalzo Decl., Ex. A, Annex B at 4 ¶ 14 (emphasis added).)  The Court therefore need not decide the issue of arbitrability because the parties adoption of the ICC Rules is "clear and unmistakable" evidence of their agreement to allow the ICC tribunal, rather than the courts, decide whether specific disputes are arbitrable.

As this Court has recently observed, "[t]he FAA reflects 'a strong policy favoring arbitration as an alternative means of dispute resolution.'" *Coscarelli v. Esquared Hospitality LLC*, 364 F. Supp. 3d 207, 215 (S.D.N.Y. 2019) (Furman, J.) (citations omitted).  For this reason, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," including where "the problem at hand is the construction of the contract language itself." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25 (1983); *Coscarelli*, 364 F. Supp. 3d, at 215 (acknowledging that "in determining the scope of arbitration clauses, courts

generally apply a presumption in favor of arbitrability," and describing that presumption as "well established").[6]

To be sure, the FAA generally presumes that the issue of "arbitrability should be resolved by the courts." *Offshore Exploration & Prod., LLC v. Morgan Stanley Private Bank, N.A.*, 626 F. App'x 303, 305 (2d Cir. 2015) (quoting *Contec Corp. v. Remote Solution, Co.*, 398 F.3d 205, 208 (2d Cir. 2005)); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995). But this presumption is overcome by "clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Offshore Exploration & Prod.*, 626 F. App'x at 305 (quoting *Contec*, 398 F.3d at 208); *see also Alstom v. Gen. Elec. Co.*, 228 F. Supp. 3d 244, 248 (S.D.N.Y. 2017) (Furman, J.) ("It is well established that '[t]he question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the "question of arbitrability," is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.'" (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002))).

Here, the parties provided such "clear and unmistakable evidence" of their intent to delegate the issue of arbitrability to the ICC tribunal by incorporating the ICC Rules into the arbitration clause in their Purchase Order Contract. *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 122–25 (2d Cir. 2003) (finding parties' incorporation of the ICC Rules—which "assign the arbitrator initial responsibility to determine issues of arbitrability"—constitutes "clear

---

[6] Although the threshold question of who decides the arbitrability of Dahra's claims—the arbitrator or the Court—is governed by U.S. law, English law (which the Court can take judicial notice of under Rule 44.1 of the Fed. R. Civ. P.) is virtually identical. Like the FAA, the English Arbitration Act 1996 (the "EAA") expressly empowers an arbitration panel to "rule on its own substantive jurisdiction," including "what matters have been submitted to arbitration in accordance with the arbitration agreement." EAA § 30(1); *see also id.* § 1(c) (stating that its provisions are based on the principle that "the parties should be free to agree how their disputes are resolved, subject only to such safeguards as are necessary in the public interest").

and unmistakable" evidence of their "intent to arbitrate questions of arbitrability"); *VRG Linhas Aereas S.A. v. MatlinPatterson Global Opportunities Partners II L.P.*, 717 F.3d 322, 326 (2d Cir. 2013) (same).[7]   Under Article 6(3) of the ICC Rules, "if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement … the arbitration shall proceed and any question of jurisdiction … shall be decided directly by the arbitral tribunal…." ICC Rules, Article 6(3).   Stated differently, Article 6(3) empowers the ICC tribunal to decide issues of arbitrability in the first instance even where there is an objection to the scope or validity of the arbitration agreement.   *Id.*   In fact, even in the extreme case where the argument for arbitration is "wholly groundless" in the eyes of the court (not an issue here), the issue of arbitrability must be resolved by the arbitration tribunal (not a court) where, as here, the parties incorporate in their arbitration agreement arbitral rules that empower the arbitrators to decide arbitrability.   *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529–31 (2019).

When faced with such "clear and unmistakable" evidence, the trend in this District is for courts to stay the action while the arbitration tribunal considers the arbitrability of the parties' dispute, and, potentially, the merits of their claims.   *See, e.g.*, *Katz v. Cellco P'ship*, 794 F.3d 341, 347) (2d Cir. 2015) (interpreting the FAA as mandating a stay of proceedings when requested and arbitrable claims have been referred to arbitration); *Washington*, 2011 WL 3251504, at *10 (staying action where parties agreed to submit issue of arbitrability to arbitrators under AAA Employment Rules); *Murray v. UBS Secs., LLC*, No. 12 Civ. 5914(KPF), 2014 WL 285093, at *14 (S.D.N.Y. Jan. 27, 2014) (staying action because "parties' agreements conclusively establish their agreement to submit the issue of arbitrability to the arbitrator" under JAMS and FINRA

---

[7] *See also Washington v. William Morris Endeavor Entm't, LLC*, No. 10 Civ. 9647 (PKC)(JCF), 2011 WL 3251504, at *6 (S.D.N.Y. July 20, 2011); *Ogden Power Dev.-Cayman, Inc. v. PMR Ltd Co.*, No. 14-cv-8169 (PKC), 2015 WL 2414581 at *4 (S.D.N.Y. May 21, 2015).

rules).  This approach is in complete accord with the language of Section 3 of the FAA, which likewise permits federal courts to stay "any issue referable to arbitration under an agreement in writing for such arbitration."[8]

In sum, there is no question that Dahra agreed to be bound by the Terms and Conditions, those Terms and Conditions contain an arbitration provision incorporating the ICC Rules (*see* Scalzo Decl., Ex. A, Annex B at 4 ¶ 14), and the ICC Rules refer gateway questions of arbitrability to the arbitration tribunal.  *See* ICC Rules, Art. 6(3); *see also Shaw Group*, 322 F.3d at 122–25; *VRG Linhas*, 717 F.3d at 326.  Although Dahra alleges that some unidentified "contract" requires the parties to litigate their disputes here (Compl. ¶ 6), under *Henry Schein*, *Shaw* and the other binding case law cited above, the issue of whether the arbitration clause in the Terms and Conditions applies to Dahra's claims is strictly for the ICC tribunal to decide.  As such, the Court should stay this case under Section 3 of the FAA while the ICC tribunal considers the arbitrability of this dispute, and, depending on the outcome of the arbitrability decisions, the merits of the parties' claims and defenses.

## II.    THE ICC ARBITRATION CLAUSE IN THE TERMS AND CONDITIONS UNQUESTIONABLY APPLIES TO COUNTS ONE AND THREE OF THE COMPLAINT

Even if this Court were to retain jurisdiction over the question of arbitrability, this action should still be stayed because the arbitration provision in the Terms and Conditions clearly applies

---

[8] Section 3 of the FAA provides that:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

to Count I and III.  As discussed above, the Terms and Conditions, which are governed by English law, contain a broadly-worded arbitration clause that "*[a]ll* disputes arising *in connection* with the [the Purchase Order Contract] shall be finally settled under the [ICC Rules]." (Scalzo Decl., Ex. A, Annex B at 4 ¶ 14 (emphasis added.).)[9]  Importantly, broad arbitration language encompass claims of any nature, including claims sounding in fraudulent inducement.  *See, e.g.*, *Merrill Lynch & Co. Inc v. Allegheny Energy, Inc.*, 500 F.3d 171, 188 (2d Cir. 2007) (holding that "an agreement to arbitrate is effective with respect to claims of fraudulent inducement that related to the contract generally"); *Vella v. Atl. Int'l Fin., Inc.*, 890 F. Supp. 321, 322 (S.D.N.Y. 1995) (articulating well-settled rule that claims of fraud in the inducement to enter into a contract containing a broad arbitration clause is subject to arbitration).  There can be no doubt that Dahra's claims in Counts I and Count III are "disputes arising in connection with" the Purchase Order Contract.

**A.     Dahra's Claims For Breach Of, And Fraudulent Inducement To Enter Into, The Purchase Order Contract Are Plainly Subject To The Arbitration Clause In The Terms And Conditions**

U.S. federal courts consider two inquiries under the FAA to determine if a dispute is arbitrable: (i) whether a valid agreement to arbitrate exists; and (ii) whether the particular dispute falls within the scope of the agreement to arbitrate.  *See Birmingham Assocs. Ltd. v. Abbott Laboratories*, 547 F. Supp. 2d 295, 300 (S.D.N.Y. 2008).  Where the existence of an agreement to arbitrate is undisputed, "doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability."  *Id.* (quoting *Collins & Aikman Prods. Co. v. Building*

---

[9] The precise language used in Paragraph 14 of the Terms and Conditions has been widely recognized by courts in this Circuit to be extremely broad and covering virtually all conceivable claims that could arise from Dahra's relationship with L3 SDS.  *See, e.g.*, *Oldroyd v. Elmira Sav. Bank*, 134 F.3d 72, 76 (2d Cir. 1998) (holding that a clause requiring the arbitration of "[a]ny dispute, controversy or claim arising under or in connection with" an agreement was "prototypical[ly] broad" and "justifies a presumption of arbitrability"); *Ferrari N. Am., Inc. v. Ogner Motor Cars, Inc.*, No. 02 Civ 7720 (SAS), 2003 WL 102839, at *3 (S.D.N.Y. Jan. 9 2003) (noting that an arbitration clause submitting all disputes "in connection with" an agreement is an "exemplary broad" provision that is "precisely the kind of broad arbitration clause that justifies a presumption of arbitrability," and indicates that the parties "intended to have arbitration serve as the primary recourse for disputes connected to the agreement").

*Sys., Inc.,* 58 F.3d 16, 19 (2d Cir. 1995)).

The Terms and Conditions clearly satisfy the first element. Dahra concedes that the Purchase Order Contract constitutes a "valid and enforceable contract." (Compl. ¶ 48; *see also* Scalzo Decl., Ex. A, Annex B.)

The second element is also satisfied because Dahra's claims for breach of, and fraudulent inducement to enter into, the Purchase Order Contract clearly fall within the scope of the parties' agreement to arbitrate "[a]ll disputes arising in connection with [the Purchase Order Contract]." Under English law, as applied by district courts in this Circuit, "arbitration clauses should be construed as broadly as possible." *Oei Hong Leong v. Goldman Sachs Group, Inc.*, No. 13-cv-8655 JMF, 2014 WL 2893310, at *5 (S.D.N.Y. June 25, 2014) (quoting *Fiona Trust & Holding Corp. v. Privalov,* [2008] 1 Lloyd's Rep. 254 260 (Lord Hope of Craighead)). Indeed, the leading United Kingdom Supreme Court case on the issue of arbitration agreements emphasized that English law precludes parties to an arbitration agreement from initiating litigation in a forum other than the designated arbitral tribunal. *See Ust-Kamenogorsk Hydropower Plant JSC v. AES Ust-Kamenogorsk Hydropower Plant LLP* [2013] UKSC 35 (An agreement to arbitrate disputes gives rise to a "negative obligation not to commence proceedings in any other forum," which is "as fundamental as any positive obligation under" an agreement). The Second Circuit and its district courts have thus interpreted English law "to presume an arbitration clause applies to all disputes arising out of the contractual relationship between the parties" absent some clear indication in the provision itself that "certain questions were intended to be excluded from the arbitrator's jurisdiction." *See Crescendo Mar. Co. v. Bank of Commc'ns Co.*, No. 15-cv-04481-JFK, 2016 WL 750351, at *10 (S.D.N.Y. Feb. 22, 2016) (quoting *Martinez v. Bloomberg LP*, 740 F.3d 221, 224–25 (2d Cir. 2014)).

Applying these standards, it is clear that Dahra's claims in Counts I and III fall within the broad scope of the arbitration clause in the Terms and Conditions.  In Count I, Dahra alleges that L3 SDS breached the Purchase Order Contract by failing to deliver two CX-Mobile units in conformity with the Commercial Offer's "technical specifications."  (Compl. ¶¶ 10, 13, 26–28, 32–33, 50 (alleging L3 SDS failed to deliver two CX-Mobile units meeting the "RGO tender specifications, as promised in the L3 SDS proposal," defined herein as the "Commercial Offer").)  These allegations, which boil down to a claim that L3 SDS "failed to honor its obligations under" the Purchase Order Contract, is "obviously" a "dispute[] arising in connection with" the Purchase Order Contract.  *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 100 (S.D.N.Y. 2015).

Duplicatively, in Count III, Dahra alleges that L3 SDS fraudulently induced Dahra to enter into the Purchase Order Contract by misrepresenting to Dahra that L3 SDS would manufacture and deliver units in conformity with the Commercial Offer's specifications.  (Compl. ¶¶ 14, 26, 33, 57, 59–60 (alleging Dahra "would not have issued the Purchase Order for the two CX Mobile units" absent L3 SDS's alleged false representations that those units would conform to the Commercial Offer's technical specifications).)  Courts in this District have consistently found under English and New York law that fraudulent inducement claims like those asserted here are "disputes arising in connection" with a parties' contract, and, therefore, fall within the scope of a broad contractual arbitration clause.  *See, e.g.*, *Martinez*, 740 F.3d at 224–25 (discussing *Fiona Trust* [2007] UKHL 40 [13–15], which compelled arbitration of a dispute regarding whether the contract containing the arbitration provision was improperly procured); *Collins*, 58 F.3d at 22–23 (reiterating the Second Circuit's oft-stated rule that a plaintiff cannot "avoid the broad language of the arbitration clause by the casting of its complaint in tort" (citations and quotations omitted)); *Vella*, 890 F. Supp. at 322 n.1 (finding claim of fraud in entering joint venture agreement was

- 14 -

subject to agreement's broad arbitration provision requiring arbitration of a "dispute concerning any aspect of this Agreement"); *Blue Tee Corp. v. Koehring Co.*, 763 F. Supp. 754, 756 (S.D.N.Y. 1991) (same); *cf. Spinelli*, 96 F. Supp. 3d at 101 (tort claims based on parties' agreement were within the scope of the agreement's broad arbitration clause).

### B.   The February 2016 Product Support Agreement Does Not Supersede Or Conflict With The Terms And Conditions

Despite its clear and unmistakable agreement to arbitrate, Dahra improperly filed suit here, vaguely alleging that the parties agreed in some unidentified "contract" that "this Court is an appropriate venue in which to resolve disputes between the parties."  (Compl. ¶ 6).  Presumably, the "contract" to which Dahra refers is the unsigned February 2016 Product Support Agreement, but the Complaint is remarkably ambiguous about this point.  Dahra's apparent reliance on the venue clause in the February 2016 Product Support Agreement fails for five reasons:  *First*, Dahra cannot maintain a claim for breach of the February 2016 Product Support Agreement, let alone rely on its venue clause, because it admittedly failed to satisfy its own obligations under the Agreement; *second*, the February 2016 Product Support Agreement, even if enforceable (which it is not), does not amend the arbitration provision in the Terms and Conditions Agreement; *third*, the narrow venue clause in the February 2016 Product Support Agreement does not conflict with the arbitration clause in the Terms and Conditions because it applies only to claims "brought to enforce any provision" of the February 2016 Product Support Agreement and nothing more; *fourth*, the claim in Count II for breach of the February 2016 Product Support Agreement is the only claim in the Complaint that arguably seeks to enforce a provision of that Agreement; and, *fifth*, resolution of Count II will be fully resolved by a ruling on whether L3 SDS satisfied the terms of its Commercial Offer—an issue that is unquestionably subject to arbitration for the reasons

discussed above.  The Court should, therefore, stay Dahra's claim for breach of the February 2016

Product Support Agreement pending the ICC's arbitrability determination as to Counts I and III.

> **i.** **Dahra's Claim For Breach Of The February 2016 Product Support Agreement, As Well As Its Reliance On The Agreement's Venue Clause, Fail Because Dahra Admittedly Did Not Perform Its Own Obligations Under The Agreement**

Under New York law, the elements of a breach of contract claim are: (1) formation of a

contract; (2) performance by one party; (3) breach of the agreement by the other party; and (4)

damages.  *See, e.g.*, *J&L Am. Enters., Ltd. v. DSA Direct, LLC*, No. 401937/05, 2006 WL 216680

(N.Y. Sup. Ct., N.Y. Cty. Jan. 27, 2006) (citing *Furia v. Furia*, 116 A.D.2d 694 (2d Dep't 1986)).

The Complaint does not allege, even in conclusory fashion, that Dahra performed all of its

obligations under the February 2016 Product Support Agreement.  In fact, the allegations in the

Complaint confirm the opposite is true.  Under Paragraph 3 of the February 2016 Product Support

Agreement, L3 SDS's provision of Services was contingent upon Dahra's payment of 25% (or

$153,394) of the $613,576 still owed under the Purchase Order within ten days after execution of

the Agreement and the remaining 75% after handover of the CX-Mobile units.  (Scalzo Decl., Ex.

D ¶ 3.)  Dahra concedes in Paragraph 17 of the Complaint, however, that it never made either of

these payments, much less the first payment necessary for L3 SDS to begin providing the Services

under the Agreement.  (Compl. ¶ 17; *see also* Scalzo Decl., Ex. D ¶ 3 (making the provision of

Services contingent on Dahra's payment of the first 25% of the $613,576 owed).  Dahra's admitted

failure to fully comply with its own obligations in the February 2016 Product Support Agreement

not only mandates dismissal of its breach of contract claim in Count II, *see infra* Section III.A.,

but it also precludes Dahra from relying on the Agreement's venue clause to ground venue in this

Court over the claims in Counts I and III relating to the Purchase Order Contract.  *See Global*

*Entm't, Inc. v. N.Y. Tel. Co.*, No. 00 Civ. 2959 (SHS), 2000 WL 1672327, at *4 (S.D.N.Y. Nov. 6,

2000) (dismissing breach of contract claim where plaintiff failed to allege that it fully performed its own contractual obligations); *Ace Secs. Corp. Home Equity Loan Trust, Series 2007-HE3 by HSBC Bank USA, Nat'l Ass'n v. DB Structured Prods., Inc.*, 5 F. Supp. 3d 543, 560–61 (S.D.N.Y. 2014) ("A plaintiff's entitlement to sue for breach of contract depends on whether it has performed its own obligations." (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996))).

### ii.    The Arbitration Clause In The Terms And Conditions May Only Be Amended By A Signed Writing Executed By Both Parties

Even apart from its inability to allege its own performance under the February 2016 Product Support Agreement, Dahra does not contend, nor could it, that the Agreement amended the arbitration clause in the Terms and Conditions.  Paragraph 15 of the Terms and Conditions Agreement sets forth strict conditions for amending its terms: "This agreement may be modified only by a subsequent written agreement which purports to do so, which refers specifically [to the Terms and Conditions], and which is signed by duly authorized officers of both parties. [10]  (Scalzo Decl., Ex. A at 30 ¶ 15.)  The February 2016 Product Support Agreement does not satisfy these conditions.  Specifically, the February 2016 Product Support Agreement is not a writing "signed by duly authorized officers of both parties" that refers specifically to the Terms and Conditions and "purports" to amend them.  Dahra's counsel has, in fact, confirmed what L3 SDS already knew to be the case:  L3 SDS never signed the version of the February 2016 Product Support Agreement signed by Dahra and which contains the narrow venue clause upon which Dahra apparently relies as grounds for venue in this Court.  (Scalzo Decl. ¶ 7.)  Accordingly, the February 2016 Product

---

[10]  Under both U.S. and English law, merger clauses and clauses specifying modification conditions like those in the Terms and Conditions Agreement are routinely found to be enforceable.  *See, e.g.*, *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 411 (S.D.N.Y. 2011) (enforcing modification condition which required the modification to be "in writing and signed by all of the parties hereto") (citing *inter alia Deutsche Bank AG v. JPMorgan Chase Bank*, No. 04 Civ. 7192, 2007 WL 2823129, at *23-*24 (S.D.N.Y. Sept. 27, 2007), *aff'd*, 331 Fed. Appx. 39 (2d Cir. 2009)); Rock Advertising Ltd v MWB Business Exchange Centres Ltd [2018] UKSC 24 ¶ 10 (appeal taken from Eng.) ("[T]he law should and does give effect to a contractual provision requiring specified formalities to be observed for a variation.").

Support Agreement did not amend the broad arbitration provision in the Terms and Conditions with a venue clause providing for litigation in the New York courts.[11]  *See, e.g.*, *BNP Paribas*, 778 F. Supp. 2d at 411–12 ("Where a contract provides a procedure for amending contract provisions, that procedure must be followed to execute a valid amendment."); *Kleinberg v. Radian Grp., Inc.*, No. 01-cv-09295-RMB-GWG, 2002 WL 31422884, at *5 (S.D.N.Y. Oct. 9, 2002) (finding that subsequent promises memorialized by one party did not amend agreement as promise did not meet signature requirements in agreement's modification provision or N.Y. Gen. Oblig. Law § 15-301.1); *GLC Securityholder LLC v Goldman, Sachs & Co.*, 74 A.D.3d 611, 612 (1st Dep't 2010) (holding that an integrated indenture agreement with a modification provision could not be modified by parties' conduct or side agreements that did not follow amendment procedure).

### iii.   The February 2016 Product Support Agreement And The Terms And Conditions Are Not In Conflict

To the extent Dahra attempts to argue that the venue clause in the February 2016 Product Support Agreement "controls" because it conflicts with the arbitration clause in the Terms and Conditions, this argument fails as a matter of basic contract interpretation.  (*See* Scalzo Decl., Ex. D ¶ 1 ("In the event of a conflict between the provisions of this Agreement and the terms and conditions of any Purchase Order, the provisions of this Agreement shall control.").)   The venue clause in the February 2016 Product Agreement is a "narrow" clause insofar as it only designates

---

[11] The warranty provisions in the February 2016 Product Support Agreement, in contrast, expressly states that it is "the only warranty applicable to the (2) CX-Mobiles, and supersedes any and all other warranties that may exist or were made a part of the Purchase Order."  As the courts in this Circuit have repeatedly observed, one of the most firmly established principles of contract interpretation is that when parties choose to include language in one provision but not another, courts should usually assume that the parties did so purposefully.  *See, e.g.*, *Bank of N.Y. Mellon Trust Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 306–07 (2d Cir. 2016) (noting the presence of language in one provision of agreement but not another as "particularly significant" and that "[s]ophisticated lawyers . . . must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so" (citation omitted)).  Applying this principle here, the Court should conclude that the parties intentionally chose not to have the venue clause in the February 2016 Product Support Agreement supersede the arbitration provision in the Terms and Conditions applicable to the Purchase Order Contract.

the New York courts as the proper fora for "all legal proceedings of any kind or nature brought to enforce any provisions of *this* Agreement." (Scalzo Decl., Ex. D ¶ 18 (emphasis added)); *see also ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24, 32 (2d Cir. 2002) ("[T]he phrase 'arise under [this agreement]' in an arbitration clause renders the clause a narrow one if unaccompanied by an expansive phrase such as 'relating to.'" (citations omitted)); *Starr Indem. & Liab. Co. v. Am. Claims Mgmt., Inc.*, No. 14-CV-0463 (JMF), 2015 WL 2152816, at *3 (S.D.N.Y. May 7, 2015) (Furman, J.) (finding choice of law provision pertaining "only to 'this Agreement'" was a narrow clause that did not cover all "conflicts that are related to or arising out of the Agreement"). In contrast, the arbitration provision in the Terms and Conditions, as discussed above, is broad and encompasses "[a]ll disputes arising in connection with [the Purchase Order Contract]." (Scalzo Decl., Ex. A, Annex B at 4 ¶ 14.)

These two clauses do not conflict on their face. The venue clause in the February 2016 Product Support Agreement designates the New York courts as the venue for claims to enforce any provisions of *that* Agreement (*i.e.*, Count II), whereas the arbitration clause in the Terms and Conditions designates ICC arbitration as the procedure for resolving all disputes in connection with the Purchase Order Contract (*i.e.*, Counts I and III). Had Dahra performed its obligations under the February 2016 Product Support Agreement, the venue clause would apply to Dahra's claims in Count II for L3 SDS's alleged failure to perform the additional "upgradation plan" and "refurbishment" in breach of Section 3 and its alleged failure to honor warranty obligations in breach of Section 7 because both of those claims seek to enforce provisions of that Agreement. (*See* Scalzo Decl., Ex. D ¶¶ 3, 7.) The arbitration clause in the Terms and Conditions, on the other hand, applies to Dahra's claims for L3 SDS's alleged failure to satisfy, as allegedly promised, the technical specifications in the Commercial Offer. (*Id.*, Ex. A, Annex A, B.) In short, both

provisions can be given effect without offending the other.  *See Consol. Precision Prods. Corp. v. Gen. Elec. Co.*, No. 1:15-cv-08721-PKC, 2016 WL 2766662, at *6–7 (S.D.N.Y. May 12, 2016) (holding that the "parties' respective consents to jurisdiction [in New York state courts]" contained in a master supply agreement "d[id] not raise a conflict with the arbitration provision contained in . . . the Terms and Conditions" because consenting to jurisdiction in state courts "does not require any dispute to be resolved in such tribunals").

> ### iv.   Dahra's Claim For Breach Of The February 2016 Purchase Order (Count II) Should Not Be Allowed To Proceed In Parallel To The Arbitration

"The decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket," and stays are "particularly appropriate if the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 856 (2d Cir. 1987).  Where the outcome of the arbitrable claims will have a "significant bearing" on the claims remaining in litigation, a stay is necessary.  *Maritima De Ecologia, S.A. de C.V. v. Sealion Shipping Ltd.*, No. 10 Civ. 8134 (DLC), 2011 WL 1465744, at *5 (S.D.N.Y. Apr. 15, 2011) (granting motion to stay in favor of arbitration governed by English law); *Mobile Real Estate, LLC v. NewPoint Media Grp., LLC*, No. 19-CV-11475 (KMK), 2020 WL 2521451, at *16 (S.D.N.Y. May 18, 2020) (staying action where there was "significant factual overlap" between claims and the ultimate determination of the arbitrator would inform the Court's decision on issue of arbitrability of some claims).

Here, Dahra's claims arising in connection with the Purchase Order Contract (Counts I and III) clearly "predominate" this lawsuit, and the resolution of those claims will bear directly on the resolution of Dahra's claim for breach of the February 2016 Product Support Agreement (Count II).  Indeed, any decision regarding whether L3 SDS breached the February 2016 Product Support Agreement will involve legal and factual determinations about whether L3 SDS breached the

Purchase Order Contract by allegedly failing to manufacture and deliver CX-Mobile units in conformity with the Commercial Offer's technical specifications.  For example, if the ICC tribunal rejects Dahra's claim for breach of the Purchase Order Contract because the two CX-Mobile units delivered by L3 SDS conformed with the Commercial Offer's specifications, then it follows that L3 SDS cannot be found liable under the February 2016 Product Support Agreement for failing to allegedly provide repair or warranty work for the CX-Mobile units' alleged nonconformities with those same technical specifications.

For that reason, and the others stated above, Dahra's claims for breach of, and fraudulent inducement into, the Purchase Order Contract should "go first" in arbitration, as the resolution of those claims in L3 SDS's favor would effectively moot any claim for breach of the February 2016 Product Support Agreement (which, in any event, fails as a matter of law for the reasons discussed above).  Moreover, a stay minimizes the risk of inconsistent judgments from this Court and the ICC, preserves judicial resources (at a time when doing so is of paramount importance), and avoids piecemeal litigation and duplicative discovery efforts.  *See Maritima*, 2011 WL 1465744, at *5.  Furthermore, a stay would give force to the English law chosen by the parties in the Terms and Conditions, which requires English courts to stay proceedings brought in contravention of an arbitration clause.  *See* EAA §§ 9(1), 9(4).[12]

---

[12] EAA Sections 9(1) and 9(4) provide as follows:

 (1) A party to an arbitration agreement against whom legal proceedings are brought (whether by way of claim or counterclaim) in respect of a matter which under the agreement is to be referred to arbitration may (upon notice to the other parties to the proceedings) apply to the court in which the proceedings have been brought to stay the proceedings so far as they concern that matter.
…
(4) On an application under this section the court shall grant a stay unless satisfied that the arbitration agreement is null and void, inoperative, or incapable of being performed.

### III.   IF THE COURT RETAINS JURISDICTION OVER THIS MATTER, DAHRA'S CLAIMS FOR BREACH OF THE FEBRUARY 2016 PRODUCT SUPPORT AGREEMENT AND FRAUDULENT INDUCEMENT SHOULD BE DISMISSED

#### A.   Dahra's Claim For Breach Of The February 2016 Product Support Agreement Fails Because Dahra Admittedly Failed To Perform Its Own Obligations Under The Agreement

As discussed above, in Section II.B.i., Dahra does not, and cannot, plead the essential element of performance of its own payment obligations under the February 2016 Product Support Agreement.  Accordingly, Dahra's breach of contract claim against L3 SDS in Count II must be dismissed given Dahra's admitted failure to meet its own contractual obligations under the February 2016 Product Support Agreement.  *See J&L Am. Enters., Ltd. v. DSA Direct, LLC*, No. 401937/05, 2006 WL 216680, at *5 (N.Y. Sup. Ct., N.Y. Cty. Jan. 27, 2006) (noting that performance of the contract by plaintiff is a required element of a breach of contract claim)).

#### B.   Dahra's Fraudulent Inducement Claim Should Be Dismissed As Duplicative Of The Claim For Breach Of The Purchase Order Contract

Dahra's claim for fraudulent inducement violates the well-settled rule that a cause of action for fraud cannot arise out of the same facts that serve as the basis for a cause of action for breach of contract.  *See, e.g.*, *Taizhou Zhongneng Imp. & Exp. Co., Ltd v. Koutsobinas*, 509 F. App'x 54, 57 (2d Cir. 2013) (dismissing fraud claims because they were "nothing more than a restatement of [the] breach of contract claim").  Therefore, Count III of the Complaint should be dismissed.

The Second Circuit has explained that "[t]o maintain a claim of fraud where breach of contract is also alleged, a plaintiff must either (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."  *Bridgestone/Firestone v. Recovery Credit Servs.*, 98 F.3d 13, 20 (2d Cir. 1996) (internal citations and quotation marks omitted); *Negrete v. Citibank,*

- 22 -

*N.A.*, 759 F. App'x 42, 48 (2d Cir. 2019) (same).  Dahra does nothing of the sort, but instead, simply re-packages its breach of contract claim as a claim for fraud.

*First*, Dahra does not (and cannot) allege that L3 SDS owed Dahra any legal duty other than as a contract counterparty with obligations to perform under the parties' agreements.  In fact, the Complaint concedes that the parties had an arm's-length business relationship with one another.  (*See, e.g.,* Compl. ¶¶ 17, 19, 48.)

*Second*, each of the "misrepresentations" alleged by Dahra are virtually identical to the contractual obligations in the Purchase Order Contract that L3 SDS allegedly failed to meet.  To take just one example, Dahra alleges that L3 SDS "***breached the Purchase Order***…by failing to ***deliver and commission CX Mobile units that met or exceeded each of the RGO Tender specifications***…." (Compl. ¶ 50 (emphasis added).)  Dahra then makes exactly the same allegation in support of its fraudulent inducement claim: "L3 SDS ***falsely and fraudulently represented*** that it would ***manufacture deliver, and successfully commission two CX Mobile units that met or exceeded each of the RGO Tender specifications***."[13]  (Compl. ¶ 57 (emphasis added).)  Simply recasting the same breach of contract allegations as "fraudulent inducement" is the hallmark of duplicative pleading.

*Third*, Dahra does not, and cannot, plead fraud damages distinct from the $6.2 million in damages alleged arising out of its claim for breach of the Purchase Order Contract.  Dahra conclusorily alleges that it suffered an unspecified amount of lost profits and the loss of unidentified customer relationships as a result of L3 SDS's supposed fraudulent inducement.  (*Id.* ¶ 61.)  But Paragraph 14 of the Terms and Conditions expressly precludes the recovery of such

---

[13]  Notably, Dahra recites the same purported nonconformities with the CX Mobile units in its breach of contract and fraudulent inducements counts, claiming in one count that those nonconformities constitute breach of contract, and, in another count, that they constitute fraudulent inducement.  (*Compare* Compl. ¶¶ 50(a)–(e), 57(a)–(e).)

indirect, incidental or consequential damages "regardless of the legal or equitable basis of any claim." (Scalzo Decl., Ex. A at 30 ¶ 14); *see also, e.g., TOA Sys., Inc. v. Int'l Bus. Machs. Corp.*, No. 18 CV 10685 (VB), 2019 WL 5693388, at *3 (S.D.N.Y. Nov. 4, 2019) (enforcing limitation on liability clause that expressly barred "special, indirect, punitive, incidental or consequential damages" in agreement between, and subsequently amended by, two sophisticated parties); *see also Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 138 & n.6 (2d Cir. 2016) ("New York courts have routinely enforced liability-limitation provisions when contracted by sophisticated parties . . . . Business entities negotiating in a commercial setting do not warrant any special solicitude as 'unsophisticated' parties simply because they are new to a particular industry and choose to forego representation by counsel."). The Complaint pleads no facts to suggest this provision is unenforceable, and, in fact, alleges that the Purchase Order Contract, which includes the Terms and Conditions, is "valid and enforceable." [14] (Compl. ¶ 48.)

In sum, Dahra's claim for fraudulent inducement is duplicative of the contract claims. Accordingly, if the Court elects to retain jurisdiction, Count III should be dismissed as a matter of law. *See Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 197 (S.D.N.Y. 2011) ("Under New York law, a cause of action sounding in fraud cannot be maintained when the only fraud charged relates to a breach of contract."); *Presnall v. Analogic Corp.*, No. 17-cv-6662, 2018 WL 4473337, at *8 (S.D.N.Y. Sept. 18, 2018) ("Because it is duplicative of

---

[14] Paragraph 14 of the Terms and Conditions also would negate any allegation by Dahra that recovery of lost profits and damages "within the contemplation of the parties at the time the [Purchase Order Contract] was entered into." *See Electron Trading LLC v. Perkins Coie LLP*, No. 652178/2018, 2019 WL 5067910 (N.Y. Sup. Ct., N.Y. Cty. Oct. 9, 2019). Nor does the Complaint attempt to allege with "reasonable certainty" the lost profits or business reputation damages to Dahra, as it must under New York law. *Id.*; *Kantor v. 75 Worth St., LLC*, 95 A.D.3d 718, 718 (1st Dep't 2012) (affirming dismissal of claims for lost profits when "nothing in the record indicates that the parties' agreement contemplated, in the event of defendants' breach, that defendants would be liable for plaintiff's failure to realize profits"); *see also Maricultura Del Norte, S. DE R.L. DE C.V. v. Worldbusiness Capital, Inc.*, 159 F. Supp. 3d 368, 378–79 (S.D.N.Y. 2015) (dismissing fraud claim as duplicative of breach of contract claim where plaintiff did not adequately plead how special damages caused by the fraud were unrecoverable as contract damages).

plaintiff's breach of contract claim … defendants' motion to dismiss the fraud claim is granted").

## CONCLUSION

For the reasons stated above, the Court should direct Counts I and III to proceed in the pending ICC arbitration and stay this case as to Count II.  In the alternative, the Court should dismiss Counts II and III pursuant to Rule 12(b)(6) of the Fed. R. Civ. P.  The Court should also grant L3 SDS such relief as the Court deems just and proper.

Dated:  June 15, 2020                                REED SMITH LLP


                                                     By: _/s/ John C. Scalzo_____
                                                          John C. Scalzo
                                                          Christopher P. Hoffman

                                                     599 Lexington Avenue
                                                     New York, NY 10022
                                                     Tel. (212) 521-5400
                                                     Fax (212) 521-5450
                                                     jscalzo@reedsmith.com
                                                     choffman@reedsmith.com

                                                     *Attorneys for Defendant*
                                                     *L3 Security & Detection Systems, Inc.*

OF COUNSEL:
REED SMITH LLP
Karlin E. Sangdahl
10 South Wacker Drive
40th Floor
Chicago, IL 60606
Tel. (312) 207-1000
ksangdahl@reedsmith.com